IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| POULOS, INC., an Illinois corporation, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.: 08cv3396 |
| v. | ) | |
| | ) | District Judge: Shadur |
| HARTFORD FIRE INSURANCE COMPANY, | ) | Magistrate Judge: Cox |
| a Connecticut corporation, | ) | |
| | ) | |
| Defendant. | ) | |

## HARTFORD FIRE INSURANCE COMPANY'S ANSWER AND AFFIRMATIVE DEFENSES

COMES NOW Defendant Hartford Fire Insurance Company ("Hartford"), by and through their attorneys John E. Sebastian and Albert L. Chollet, III, of Hinshaw & Culbertson LLP, and in Answer to Plaintiff Poulos, Inc.'s ("Plaintiff") Complaint, states as follows:

### PARTIES

1.     Poulos is a corporation organized under the laws and authority of the State of Illinois with a principal place of business located in Chicago, Illinois. Poulos is in the business of providing general contracting and construction services.

**ANSWER:**    Hartford admits plaintiff is in the business of general contracting, that Poulos' has an address listed in the City of Chicago, and that Poulos is listed as a corporation in good standing with the illinois Secretary of State's website for registered Illinois corporations.

2.     Hartford is a corporation organized under the laws and authority of the State of Connecticut with a principal place of business located in Hartford, Connecticut. Hartford is in the business, among other things, of selling and issuing performance bonds to general contractors for construction projects.

**ANSWER:**    Hartford admits the allegations in Paragraph 2 of Plaintiff's Complaint.

## JURISDICTION AND VENUE

3.    This matter arises out of three (3) performance bonds issued by Hartford to Grace Electrical Construction Corporation ("Grace"), a subcontractor of Poulos, for the benefit of Poulos (collectively the "Performance Bonds"), related to construction contracts for improvements to the Bradford Anderson Oglesby Public Library ("Bradford Project"), Stickney Village Hall ("Stickney Project"), and the Sunny Hill Nursing Home of Will County ("Sunny Hill Project") (collectively the "Projects"). The Performance Bonds Hartford issued are all identical in form and substance. The Performance Bonds for the Bradford, Stickney and Sunny Hill projects are attached hereto as Exhibits A, B, and C, respectively.

**ANSWER:**    Hartford admits that it issued, as surety, Performance Bond number 83BCSEB7711 ("Bradford Bond") on behalf of Grace Electrical Construction Corporation ("Grace"), as principal, for a construction project known as the Bradford Project. Hartford admits that it issued, as surety, Performance Bond number 83BCSEJ1942 ("Stickney Bond") on behalf of Grace, as principal, for a construction project known as the Stickney Project. Hartford further admits that it issued, as surety, Performance Bond number 83BCSEB7701 ("Sunny Hill Bond") on behalf of Grace, as principal, for a construction project known as the Sunny Hill Project.

4.    The Bradford Project and Stickney Projects are both located in Cook County, Illinois, and the Sunny Hill Project is located in Will County, Illinois.

**ANSWER:**    Hartford admits the allegations contained in paragraph 4.

5.    Jurisdiction is proper pursuant to 28 U.S.C. § 1332(a), in that Plaintiff and Defendant are citizens of different states, and the matter in controversy exceeds $75,000, as is further explained below.

**ANSWER:**    Hartford admits that the plaintiff alleges that it has damages of $ $75,000.

2

Hartford denies that Plaintiff is entitled to anything from Hartford.

6.    Venue is proper in this Court pursuant to § 9 of the Performance Bonds, which provides that "Any proceeding, legal or equitable, under this Bond may be instituted in any court of competent jurisdiction in the location in which the work or part of the work is located."

**ANSWER:**    Hartford admits the allegations in paragraph 6.

7.    Independently, venue is proper pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events giving rise to Poulos' request for relief occurred within the Northern District of Illinois and the properties which are the subject of the Performance Bonds are located in the Northern District of Illinois. Two important aspects of the dispute between the parties are the terms of the Performance Bonds and actions of Hartford. The Performance Bonds were negotiated and executed in the Northern District of Illinois, and the instructions and actions of Hartford, as they relate to the Performance Bonds and this dispute, occurred in the Northern District of Illinois.

**ANSWER:**    Hartford admits the allegations in paragraph 7.

### FACTUAL BACKGROUND

8.    In or about June 2006, Poulos entered into an agreement with the Will County Public Building Commission to provide general contracting and construction services for the Sunny Hill Project ("Sunny Hill Prime Contract"). In accordance with Article 5 of the Sunny Hill Prime Contract, Poulos executed a subcontract with Grace dated June 6, 2006, to perform all of the electrical work for the Sunny Hill Project ("Sunny Hill Subcontract").

**ANSWER:**    Hartford admits that Poulos entered into a contract with Will County for the Sunny Hill Project and that Poulos entered into a subcontract with Grace to perform the electrical work as defined by the subcontract for the Sunny Hill Project.

9.    In or about October 2006, Poulos entered into an agreement with the City of

3

Markham to provide general contracting and construction services for the Bradford Project ("Bradford Prime Contract"). In accordance with Article 5 of the Bradford Prime Contract, Poulos executed a subcontract with Grace dated October 20, 2006, to perform all of the electrical work for the Bradford Project ("Bradford Subcontract").

**ANSWER:** Hartford admits that Poulos entered into a contract with the City of Markham for the Bradford Project and that Poulos entered into a subcontract with Grace to perform electrical work as defined by the subcontract for the Bradford Project.

10.    In or about April 2007, Poulos entered into an agreement with the Village of Stickney to provide general contracting and construction services for the Stickney Project ("Stickney Prime Contract"). In accordance with Article 5 of the Stickney Prime Contract, Poulos executed a subcontract with Grace dated April 26, 2007, to perform all of the electrical work for the Stickney Project ("Stickney Subcontract").

**ANSWER:** Hartford admits that Poulos entered into a contract with the Village of Stickney for the Stickney Project and that Poulos entered into a subcontract with Grace to perform the electrical work as defined by the subcontract for the Stickney Project.

11.    Pursuant to Article 9 of the Sunny Hill, Bradford and Stickney Subcontracts (collectively "the Subcontracts"), Grace furnished Poulos performance bonds issued by Hartford and respectively identified as Performance Bond Number 83BCSEB7701, 83BCSEB7711 and 83BCSEJ1942 for the Projects.

**ANSWER:** Hartford admits that at the request of Grace, Hartford issued as surety, Performance Bond number 83BCSEB7711 ("Bradford Bond") on behalf of Grace Electrical Construction Corporation ("Grace"), as principal, for a construction project known as the Bradford Project. Hartford admits that it issued, as surety, Performance Bond number

4

83BCSEJ1942 ("Stickney Bond") on behalf of Grace, as principal, for a construction project known as the Stickney Project. Hartford further admits that it issued, as surety, Performance Bond number 83BCSEB7701 ("Sunny Hill Bond") on behalf of Grace, as principal, for a construction project known as the Sunny Hill Project.

<u>The Hartford Performance Bonds</u>

12.     Poulos is defined as the "Owner" and Grace is defined as the "Contractor" in the Performance Bonds. The Performance Bonds reference and incorporate the terms of the respective Subcontracts and define each Subcontract as "Construction Contract." The Performance Bonds state that the Surety binds itself to the Owner for the performance of the Construction Contract. See Performance Bonds Page 1 and Article I.

**ANSWER:**    Hartford admits that the Bonds contain the quoted terms and definitions as stated in paragraph 12.

13.     The Performance Bonds provide that the Surety's obligations under the Performance Bonds arise after (i) Poulos has notified Grace and the Surety it is considering declaring a Contractor Default and requests to arrange a conference with Grace and the Surety to be held no later than fifteen days after receipt of such notice to discuss methods of performing the Construction Contract; (ii) Poulos has declared a Contractor Default and formerly terminated Grace's right to complete the Construction Contract; and (iii) Poulos has agreed to pay the Balance of the Construction Contract to the Surety in accordance with the terms of the Construction Contract or to a contractor selected to perform the Construction Contract in accordance with the terms of the contract with the Owner. *Id.* Article 3.

**ANSWER:**    Hartford admits that subparagraphs (i), (ii), (iii) are contained in the Bonds. Hartford denies that paragraph 13 sets forth all of the conditions precedent to invoke the Surety's obligations under the Bonds.

5

14.    Hartford's obligations under the Performance Bonds include (i) arranging for Grace to complete the Construction Contract, if Poulos consents; or (ii) undertaking to perform and complete the Construction Contract itself; or (iii) obtaining bids from qualified contractors acceptable to Poulos for completion of the Construction Contract, arranging for a contract to be executed by Poulos and approved contractor, to be secured with performance and payment bonds executed by a qualified surety, and paying to Poulos the amount of damages in excess of the Balance of the Contract Price incurred by Poulos resulting from Grace's default; or (iv) waiving its right to perform and complete, arrange for completion, or obtain a new contractor, and with reasonable promptness either determine the amount the Surety is liable to Poulos and tender payment thereof or deny liability in whole or in part and notify Poulos citing the reasons thereof. *Id.* Article 4.

**ANSWER:**    Hartford admits that subparagraphs (i), (ii), (iii), (iv) are contained in the Bonds. Hartford denies that paragraph 14 sets forth all of the conditions precedent to invoke the Surety's obligations under the Bonds.

15.    Article 5 of the Performance Bonds provides that the Surety shall be deemed in default of the Performance Bonds if it does not proceed with reasonable promptness as provided in Section 4 of the Performance Bonds. *Id.* Article 5.

**ANSWER:**    Hartford admits the allegations in paragraph 15 are contained in the Bonds. Hartford further states that there are other terms and conditions of the Bonds that determine its obligations under the Bonds.

16.    In addition to amounts that become due related to performance of the Subcontracts, Hartford agreed to be liable for costs to correct Grace's defective work, and additional legal, design professional and delay costs resulting from Grace's default and resulting

6

from the actions or failure to act of Hartford under the Performance Bonds. *Id.* § 6.2.

**ANSWER:**   Hartford admits that the allegations of paragraph 16 are in the Bond. Hartford further states there are other terms and conditions that determine its obligations under the Bonds.

17.   On or about November 7, 2007, Grace advised Poulos that it would be unable to complete its performance of the Subcontracts.  Grace subsequently sent three separate written notices to Hartford and Poulos advising the parties that it was unable to complete performance of the work under the Subcontracts, and requested that Hartford take such steps as it deems necessary to perform its obligations as Surety.  Copies of the three notices sent by Grace are attached hereto as Exhibits D, E, and F, respectively.

**ANSWER:**   Hartford denies the allegations contained in paragraph 17.   Hartford further states that these letters, Exhibits D, E, and F, were obtained by Hartford from Grace on or about December 4, 2007 and then Hartford tendered the letters in Exhibits D, E, and F to Poulos on December 4, 2007 and that Poulos never terminated Grace under the subcontracts.

18.   On or about November 8, 2007, Poulos sent three written notices advising Hartford that Poulos was considering, and saw no alternative to, declaring Grace in default of the Subcontracts and requesting to arrange a conference with Grace and Hartford to discuss methods of completing performance of the Subcontracts.  Copies of the three notices sent by Poulos are attached hereto as Exhibits G, H, and I, respectively.

**ANSWER:**   Hartford denies the allegations contained in paragraph 18.   Hartford further states that these letters, Exhibits G, H and I, were obtained by Hartford from Grace on or about December 4, 2007 and then Hartford tendered the letters in Exhibits G, H and I to Poulos on December 4, 2007 and that Poulos never terminated Grace under the subcontracts.

6332850v1 71

19.    Hartford retained the services of Construction Consulting and Disbursement Services Inc. ("CCDS") to assist it review and process the Performance Bond claims.

**ANSWER:**    Hartford admits that it hired Construction Consulting and Disbursement Services, Inc. to assist it in connection with claims asserted against bonds Hartford issued on behalf of Grace.

20.    On or about December 4, 2007, representatives of Poulos, Hartford and CCDS met to discuss details of the three Projects and to determine how to complete performance of the Subcontracts ("December Meeting").    Poulos advised Hartford that it was concerned about the upcoming contract completion dates and requested instructions from Hartford as to how to proceed with the work of the Subcontracts. Poulos explained to Hartford and CCDS that Grace's default threatened Poulos' ability to timely complete the Projects.

**ANSWER:**    Hartford admits that representatives of Hartford conducted meetings with representatives for Plaintiff on several occasions in connection with Hartford's investigation of the Projects.  Hartford denies the remaining allegations in Paragraph 20 of Plaintiff's Complaint.

21.    At the December Meeting, Poulos advised Hartford that it had a replacement contractor, AWA Construction Company ("AWA"), who would complete the work of the Subcontracts on a time and material basis.  Poulos provided Hartford with information about AWA and its billing rates.  Hartford agreed and approved of Poulos hiring AWA to complete the work of the Subcontracts on a time and material basis.  At the same meeting, Poulos advised Hartford that it expected the cost to complete the work of the Subcontracts to exceed the contract sum of the Subcontracts.  Poulos informed Hartford that it agreed to pay the balance of the Subcontracts in accordance with the terms of the Subcontracts and Performance Bonds.

**ANSWER:**    Hartford admits that, on or about December of 2007, Plaintiff notified

8

Hartford that Plaintiff had hired a replacement contractor, AWA, to complete the work on the Projects. Hartford denies the remaining allegations in Paragraph 21.

22.     At the December Meeting, Poulos also advised Hartford and CCDS that under the Sunny Hill Prime Contract, the Owner had elected to have Poulos complete additional work for the project known as "Alternate #3." Poulos explained that it had a corresponding option under the Sunny Hill Subcontract to elect to have Grace complete the electrical work of Alternate #3, and had accordingly elected to exercise this option. Hartford agreed and approved of Poulos hiring AWA to complete the original scope of work under the Sunny Hill contract, but advised Poulos that Hartford would obtain bids for replacement contractors to complete the work of Alternate #3 of the Sunny Hill Subcontract.

**ANSWER:**     Hartford denies the first sentence of paragraph 22. Hartford states that Poulos said that the Owner was considering exercising Alternate #3. Hartford denies the second sentence of paragraph 22. Hartford states that Poulos said that it had the right to exercise Alternate #3, however, Poulos never said it was electing to exercise Alternate #3. Hartford denies the third sentence of paragraph 22. Hartford did not agree that Poulos should hire AWA and Hartford did not advise Poulos that Hartford would obtain bids for replacement contractors for Alternate #3 for the Sunny Hill Project.

23.     During the months of January and February of 2008, CCDS had its inspectors at the Bradford and Stickney Village Hall sites several times to observe the work of Poulos and AWA. At no time did CCDS provide any written or oral instructions to Poulos regarding any of the ongoing work. Nor did Hartford or CCDS ever provide any information to Poulos regarding the replacement contractors for Alternate #3 of the Sunny Hill Project.

**ANSWER:**     Hartford denies, in part, the first sentence of paragraph 23. Hartford

9

states that Hartford's consultant CCDS inspected the Bradford Project and Hartford's consultant CCDS did not inspect the Stickney Project in the months of January and February of 2008. Hartford admits the second sentence of paragraph 23. Hartford further states Poulos was already completing Grace's work by its own unilateral action prior to asserting claims against the Bonds. Hartford admits the third sentence of paragraph 23. Hartford further states Hartford nor its consultant CCDS agreed to provide Poulos any information regarding replacement contractors for Alternate #3.

24.    On March 17, 2008, Poulos sent Hartford written notice to (i) confirm that Hartford had instructed Poulos to have its replacement contractors complete the work of the Subcontracts so as not to jeopardize the Projects, (ii) demand that Hartford perform its obligations under the Performance Bonds, including payment of all amounts due under the respective Performance Bonds, and (iii) request that Hartford arrange for a meeting to discuss and resolve, inter alia, matters related to the Performance Bonds. A copy of the letter dated March 17, 2008 is attached hereto as Exhibit J.

**ANSWER:**    Hartford admits that it received a March 17, 2008 letter from Poulos.

25.    On April 2, 2008, representatives of Poulos, Hartford, CCDS, and Poulos' counsel met to discuss, inter alia, Hartford's prompt payment of all amounts due under the respective Performance Bonds and to confirm how Poulos should proceed to complete the work of Alternate #3 of the Sunny Hill Project ("April Meeting"). Poulos provided Hartford and CCDS with invoices from AWA for the Bradford and Stickney Projects that showed the contract sums for these two projects had thus far been exceeded in the amount $81,428 and $16,732, respectively. Copies of the AWA invoices submitted to Hartford are attached hereto as Exhibits K and L, respectively.

10

**ANSWER:**    Hartford admits that it met with Poulos to discuss payment bond claims and what Poulos alleged was the completion work for the Projects.  Hartford further states that Poulos provided documents to Hartford for the very first time that allegedly supported the costs Poulos incurred related to Grace's default.  Hartford denies that Poulos discussed how it should proceed to complete the work of Alternate #3 of the Sunny Hill Project.

26.    At the April Meeting, neither Hartford nor CCDS provided Poulos with any bids for replacement contractors to complete Alternate #3 of the Sunny Hill Project.  Poulos reminded Hartford that pursuant to the Sunny Hill Prime Contract, Poulos needed to immediately commence work on Alternate #3 in order to be able to complete the project by the contract completion date.  Poulos advised Hartford and CCDS that it had obtained bids from several replacement contractors for Alternate #3 to ascertain the additional cost to complete Alternate #3 and to have replacement contractors mobilized to commence the work in the event Hartford did not timely instruct Poulos to commence the work.  Poulos explained that if Hartford did not promptly instruct Poulos as to how to proceed on Alternate #3, it would be forced to direct its replacement contractor to commence the work.  Hartford advised Poulos that it would review the invoices, contract and bid documents provided by Poulos and promptly notify Poulos as to Hartford's liability under the Performance Bonds.  The bids Poulos obtained from replacement contractors to complete the work of Alternate 3 exceed Grace's contract sum by approximately $400,000.

**ANSWER:**    Hartford admits the first sentence of paragraph 26.   Hartford states that Hartford nor its consultant CCDS provided any bids to Poulos because Poulos was already completing the work of Grace prior to asserting claims against the Bonds and that Poulos did not ask Hartford to obtain bids.  Hartford admits the second sentence of paragraph 26.    Hartford

further states Poulos was already completing Grace's work by its own unilateral action. Hartford denies the third sentence of paragraph 26. Hartford further states Poulos informed Hartford that AWA continued to work on the Sunny Hill Project only. Hartford denies the fourth sentence of paragraph 26. Hartford further states Poulos informed Hartford that AWA continued to work on the Sunny Hill Project only. Hartford denies the fifth sentence of paragraph 26. Hartford further states that it informed Poulos that Hartford would review the information Poulos provided to date and request any additional information that Hartford may need to complete its investigation. Hartford denies the sixth sentence of paragraph 26. Hartford has not been provided any "bids" from Poulos for Alternate #3.

27.     Poulos has repeatedly contacted Hartford to follow up on the status of its Performance Bond claims, and in each instance, Hartford has represented that it "continues to investigate and process the claims." In letters to Hartford dated April 10, 2007 and April 30, 2007, Poulos again advised Hartford of the increasing costs it continues to incur due to Grace's default, and requested that Hartford perform its obligations as Surety under the Performance Bonds. The letters dated April 10, 2007 and April 30, 2007 are attached hereto as Exhibits M and N, respectively.

**ANSWER:**     Hartford admits that it has and continues to inform Poulos that its investigation continues regarding Poulos claims, that Hartford needs additional documents from Poulos, and that Hartford continues to review and resolve payment bond claims.

28.     Poulos has at all times cooperated with Hartford's requests for documents related to the Performance Bond claims.

**ANSWER:**     Hartford denies the allegations in Paragraph 28 of Plaintiff's Complaint.

29.     To date, Hartford has not performed its obligations as Surety under the

12

Performance Bonds.

**ANSWER:**    Hartford denies the allegations in Paragraph 29 of Plaintiff's Complaint.

30.    Hartford has unreasonably delayed in performing its obligations under the Performance Bonds.

**ANSWER:**    Hartford denies the allegation in Paragraph 30 of Plaintiff's Complaint.

**COUNT I**

**DECLARATORY RELIEF**

31.    Poulos restates and realleges paragraphs 1 through 30 as though fully set forth herein.

**ANSWER:**    Hartford hereby restates and incorporates by reference its responses to Paragraphs 1 through 30 above as though set forth fully herein.

32.    This Court is empowered by 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57 to declare the rights and obligations of the parties.

**ANSWER:**    Hartford admits the allegations in paragraph 32.

33.    Pursuant to the respective Performance Bonds, Poulos is legally entitled to payment of all amounts it incurred in excess of the Subcontract contract sums related to Grace's default of the Subcontracts, including without limitation, correction of Grace's defective work and additional legal, design professional and delay costs resulting from Grace's default and the actions or failure to act of Hartford under the Performance Bond.

**ANSWER:**    Hartford denies all allegations in paragraph 33.

34.    Poulos performed all of its obligations under the Performance Bonds (except those that have been waived, released, or rendered impossible by the acts or omissions of Hartford) including, but not limited to, the following:

        a.    Poulos notified Hartford and Grace that it was considering declaring Grace

13

in default under the Subcontracts and requested and attempted to arrange a conference with Grace and Hartford within fifteen days to discuss methods of performing the Subcontracts;

b.      Grace declared itself in default under the Subcontracts by sending written notice of its inability to complete the Subcontracts, and Poulos terminated Grace's right to complete the Subcontracts; and

c.      Poulos agreed to pay the balance of the Subcontract contract sum to Hartford in accordance with the terms of the Subcontracts or to a contractor selected to perform the Subcontracts in accordance with the terms of the Subcontracts and Performance Bonds.

**ANSWER:**     Hartford denies the allegations contained in paragraph 34 (a), (b), and (c).

35.      Hartford materially breached the Performance Bonds because it has failed or refused to perform any of its obligations specified in Article 4 of the Performance Bonds.

**ANSWER:**     Hartford denies the allegations in Paragraph 35 of Plaintiff's Complaint.

36.      Additionally, pursuant to Article 5 of the Performance Bonds, Hartford is in default of the Performance Bonds because it has failed to perform its obligations specified in Article 4 of the Performance Bonds despite receipt of additional written notices from Poulos demanding that Hartford perform its obligations under the Performance Bonds.

**ANSWER:**     Hartford denies the allegations in Paragraph 36 of Plaintiff's Complaint.

37.      Hartford's failure to timely perform its obligations as Surety has caused and continues to cause Poulos to incur damages, including without limitation, amounts incurred by Poulos to complete the work of the Subcontracts.

**ANSWER:**     Hartford denies the allegations in Paragraph 37.

38.      An actual controversy exists between Poulos and Hartford concerning their respective rights and duties under the Performance Bonds with respect to Hartford's obligation to pay Poulos the damages it incurred due to Grace's default of the Subcontracts.  Poulos is informed and believes that Hartford contends it does not have a duty to pay Poulos the damages

14

specified in the Performance Bonds.

**ANSWER:**    Hartford admits the allegations in paragraph 38.  Hartford further states that because of Poulos' actions no amount is currently due and owing to Poulos in connection with its claims against the Bonds.

39.    Poulos requests this Court to make and enter its binding judicial declarations in accordance with Poulos' contentions set forth above, and otherwise declare the rights and obligations of Poulos and Hartford under the Performance Bonds with respect to the duty of Hartford to pay Poulos the damages it has and will incur related to Grace's default under the Subcontracts, its attorney's fees, plus such other costs and expenses covered by the Performance Bonds.    The requested declarations are both necessary and proper at this time under the circumstances in that the interests of judicial economy and substantial justice will be served thereby.

**ANSWER:**    Hartford states that its obligations have been discharged under the Bonds as a result of Poulos' unilateral actions.

WHEREFORE, Hartford Fire Insurance Company ("Hartford") respectfully requests this Court enter an Order dismissing Plaintiff's Complaint against Hartford with prejudice and enter judgment in Hartford's favor, awarding Hartford its costs and fees in connection with defense of Plaintiff's action together with such other and further relief as the Court deems just and proper.

## HARTFORD FIRE INSURANCE COMPANY'S AFFIRMATIVE DEFENSES

Defendant Hartford Fire Insurance Company ("Hartford"), by and through its attorneys John E. Sebastian and Albert L. Chollet, III of Hinshaw & Culbertson LLP, and for its Affirmative Defenses to Plaintiff's, Poulos, Inc., ("Plaintiff" or "Poulos") Complaint, states as follows:

15

## FACTS APPLICABLE TO ALL AFFIRMATIVE DEFENSES

1.      At the request of Grace Electrical Construction Corporation ("Grace"), Hartford issued, as surety, Performance Bond number 83BCSEB7711 ("Bradford Bond") on behalf of Grace, as principal, for a construction project known as the Bradford Project, Hartford issued, as surety, Performance Bond number 83BCSEJ1942 ("Stickney Bond") on behalf of Grace, as principal, for a construction project known as the Stickney Project, and Hartford issued, as surety, Performance Bond number 83BCSEB7701 ("Sunny Hill Bond") on behalf of Grace, as principal, for a construction project known as the Sunny Hill Project [the bonds are collectively referred to as the "Bonds"].   A true and correct copy of the Bonds is attached hereto as Exhibit 1.

2.      Poulos alleges that it contracted with Grace for the performance of certain construction related services in connection with the Sunny Hill Projects, Bradford, and Stickney (collectively, "Projects").

3.      Poulos alleges that Grace failed to satisfy its contractual obligations and that Hartford bears responsibility for performing Grace's outstanding obligations on the Projects.

4.      Prior to placing Hartford on notice of Grace's default and otherwise following the terms of the Bonds, Poulos unilaterally retained a replacement contractor, AWA Construction, Inc. ("AWA"), to perform construction services to complete Grace's work on the Projects.

5.      A Poulos employee informed Hartford that AWA' is owned by the same individuals that own Poulos.

6.      The claim submitted by Poulos to Hartford against the Bonds includes costs and expenses that Poulos alleges it paid AWA for in order to complete Grace's contracts for the Projects.

7.      A Poulos employee informed Hartford that part of the costs claimed by Poulos did

not actually pay for, however, Poulos seeks recovery and reimbursement of those costs and expenses from Hartford under the Bonds.

8.    Poulos initiated the instant action to seek a declaration of Poulos' and Hartford's respective rights under the Bonds for the Projects.

## AFFIRMATIVE DEFENSES

## AFFIRMATIVE DEFENSE NUMBER 1

9.    Poulos failed to comply with Article 3 of the Performance Bond which establishes a procedure for notifying Hartford in the event that Poulos *contemplates* declaring Grace in default of its subcontract. By the terms of the Bonds, there are five steps Poulos must comply with in order to trigger Hartford's obligations under the Bonds.

10.    In its entirety, Article 3 of the Bonds provides as follows:

3    If there is no Owner Default, the Surety's obligation under this Bond *shall arise after:*

3.1    The Owner has notified the Contractor and the Surety at its address described in Paragraph 10 below that the Owner *is considering* declaring a Contractor Default and has requested and attempted to arrange a conference with the Contractor and the Surety to be held not later than fifteen days after receipt of such notice to discuss methods of performing the Construction Contract. If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequently to declare a Contractor Default; and

3.2    The Owner has declared a Contractor Default and formally terminated the Contractor's right to complete the contract. Such Contractor Default shall not be declared earlier than twenty days after the Contractor and the Surety have received notice as provided in Subparagraph 3.1; and

3.3    The Owner has agreed to pay the Balance of the Contract Price to the Surety in accordance with the terms of the Construction Contract or to a contractor selected to perform the Construction Contract in accordance with the terms of the contract with the Owner.

Exhibit 1, Bonds, Article 3 (emphasis added).

6332850v1 71

11.     By the terms of the Bonds, only once the bond obligee (here Poulos) complies with the procedure set out in Article 3 does the surety's (here Hartford) obligation arise under the bond.

12.     Hartford's obligations under the Bonds were discharged as a result of Poulos' employment of a replacement contractor, AWA, prior to giving Hartford notice and an opportunity to exercise its rights under the Bonds.

## AFFIRMATIVE DEFENSE NUMBER 2

13.     In the alternative, Hartford asserts that Poulos failed to mitigate its damages by not selecting the most cost effective method to complete the Projects.

14.     Poulos was aware and had the opportunity to select other methods to complete the Projects.

15.     Poulos' claim against the Bonds, should be reduced by the reduced amount that it would have cost to complete the Projects by other methods.

## AFFIRMATIVE DEFENSE NUMBER 3

16.     By violating the terms of the Bonds, unilaterally hiring AWA as a replacement contractor, Poulos breached the Bonds.  Accordingly, Poulos' claim should be denied to the extent it includes damages allegedly incurred in retaining a replacement contractor.

## AFFIRMATIVE DEFENSE NUMBER 4

17.     In the alternative, Poulos lacks any right to recover against the Bonds, to the extent that Poulos has released and/or waived its claim against the Bonds.

## AFFIRMATIVE DEFENSE NUMBER 5

18.     Poulos' claim against the Bonds includes costs and expenses that Poulos did not pay AWA yet Poulos has knowingly included these costs in its claim and lawsuit against

18

Hartford.

19.    To the extent Poulos' claim includes costs and expenses that it did not pay for or otherwise incur, Poulos' claim against the Bonds should be dismissed.

WHEREFORE, Hartford Fire Insurance Company ("Hartford") respectfully requests this Court enter an Order dismissing Plaintiff's Complaint against Hartford with prejudice and enter judgment in Hartford's favor, awarding Hartford its costs and fees in connection with defense of Plaintiff's action together with such other and further relief as the Court deems just and proper.

Respectfully submitted,

HINSHAW & CULBERTSON LLP

By:  s/John E. Sebastian
      John E. Sebastian

John E. Sebastian, ARDC Number 6230240
Albert L. Chollet III, ARDC Number 6292557
Hinshaw & Culbertson LLP
222 N. LaSalle, Suite 300
Chicago, IL 60601
312-704-3000

6332850v1 71

# Exhibit A

Case 1:08-cv-03396    Document 18-2    Filed 08/18/2008    Page 2 of 19
Case 1:08-cv-03396    Document 15-2    Filed 07/30/2008    Page 2 of 7
Case 1:08-cv-03396    Document 1-2    Filed 06/12/2008    Page 2 of 46

# **AIA** Document A312™ – 1984

## Performance Bond – BOND# 83BCSEB7711

CONTRACTOR (Name and Address):

Grace Electrical
Construction Corporation
10350 Dearlove Rd., Unit C
Glenview, IL 60025

OWNER (Name and Address):

Poulos, Inc.
735 S. Laramie Ave.
Chicago, IL 60644

SURETY (Name and Principal Place of Business):

Hartford Fire Insurance Company
4245 Meridian Parkway
Aurora, IL 60504

CONSTRUCTION CONTRACT

Date: October 20, 2006
Amount: -Three Hundred Fifty Five Thousand Dollars & No/100-
($355,000.00)-
Description (Name and Location):
Bradford Anderson Oglesby Public Library
16640 S. Kedzie
Markham, IL 60426

BOND

Date (Not earlier than Construction Contract Date): October 26, 2006
Amount: -Three Hundred Fifty Five Thousand Dollars & No/100- ($355,000.00)-
Modifications to this Bond:  [ X ]  None   [  ]  See Last Page

CONTRACTOR AS PRINCIPAL Grace
Electrical Construction Corporation
Company:     (Corporate Seal)

Signature: 
Name and
Title:  Soon Ja Chung
         President

SURETY Hartford Fire Insurance
Company
Company:     (Corporate Seal)

Signature:
Name and
Title:    William D.
          Miller, Attorney-
          in-fact

(Any additional signatures appear on the last page)

(FOR INFORMATION ONLY - Name, Address and Telephone)
AGENT or BROKER:

Kevin J. Scanlon, Columbian Agency
1005 West Laraway Road
New Lenox, IL 60451
815-485-4100

OWNER'S REPRESENTATIVE
(Architect, Engineer or other party):
Burnidge Cassell Associates, Inc.
(Architect)

ADDITIONS AND DELETIONS:
The author of this document has added information needed for its completion. The author may also have revised the text of the original AIA standard form. An Additions and Deletions Report that notes added information as well as revisions to the standard form text is available from the author and should be reviewed. A vertical line in the left margin of this document indicates where the author has added necessary information and where the author has added to or deleted from the original AIA text.

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

Any singular reference to Contract, Surety, Owner or other party shall be considered plural where applicable.



EXHIBIT
A

AIA Document A312™ – 1984. Copyright © 1984 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 09:58:49 on 10/25/2006 under Order No.1000243947_1 which expires on 9/23/2007, and is not for resale.
User Notes:                                                                   (1069358622)

1

Case 1:08-cv-03396    Document 18-2    Filed 08/18/2008    Page 3 of 19
Case 1:08-cv-03396    Document 15-2    Filed 07/30/2008    Page 3 of 7
Case 1:08-cv-03396    Document 1-2    Filed 06/12/2008    Page 3 of 46

§ 1 The Contractor and the Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner for the performance of the Construction Contract, which is incorporated herein by reference.

§ 2 If the Contractor performs the Construction Contract, the Surety and the Contractor shall have no obligation under this Bond, except to participate in conferences as provided in Section 3.1.

§ 3 If there is no Owner Default, the Surety's obligation under this Bond shall arise after:
§ 3.1 The Owner has notified the Contractor and the Surety at its address described in Section 10 below that the Owner is considering declaring a Contractor Default and has requested and attempted to arrange a conference with the Contractor and the Surety to be held not later than fifteen days after receipt of such notice to discuss methods of performing the Construction Contract. If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequently to declare a Contractor Default; and

§ 3.2 The Owner has declared a Contractor Default and formally terminated the Contractor's right to complete the contract. Such Contractor Default shall not be declared earlier than twenty days after the Contractor and the Surety have received notice as provided in Section 3.1; and

§ 3.3 The Owner has agreed to pay the Balance of the Contract Price to the Surety in accordance with the terms of the Construction Contract or to a contractor selected to perform the Construction Contract in accordance with the terms of the contract with the Owner.

§ 4 When the Owner has satisfied the conditions of Section 3, the Surety shall promptly and at the Surety's expense take one of the following actions:
§ 4.1 Arrange for the Contractor, with consent of the Owner, to perform and complete the Construction Contract; or

§ 4.2 Undertake to perform and complete the Construction Contract itself, through its agents or through independent contractors; or

§ 4.3 Obtain bids or negotiated proposals from qualified contractors acceptable to the Owner for a contract for performance and completion of the Construction Contract, arrange for a contract to be prepared for execution by the Owner and the contractor selected with the Owner's concurrence, to be secured with performance and payment bonds executed by a qualified surety equivalent to the bonds issued on the Construction Contract, and pay to the Owner the amount of damages as described in Section 6 in excess of the Balance of the Contract Price incurred by the Owner resulting from the Contractor's default; or

§ 4.4 Waive its right to perform and complete, arrange for completion, or obtain a new contractor and with reasonable promptness under the circumstances:
    .1    After investigation, determine the amount for which it may be liable to the Owner and, as soon as practicable after the amount is determined, tender payment therefor to the Owner; or
    .2    Deny liability in whole or in part and notify the Owner citing reasons therefor.

§ 5 If the Surety does not proceed as provided in Section 4 with reasonable promptness, the Surety shall be deemed to be in default on this Bond fifteen days after receipt of an additional written notice from the Owner to the Surety demanding that the Surety perform its obligations under this Bond, and the Owner shall be entitled to enforce any remedy available to the Owner. If the Surety proceeds as provided in Section 4.4, and the Owner refuses the payment tendered or the Surety has denied liability, in whole or in part, without further notice the Owner shall be entitled to enforce any remedy available to the Owner.

§ 6 After the Owner has terminated the Contractor's right to complete the Construction Contract, and if the Surety elects to act under Section 4.1, 4.2, or 4.3 above, then the responsibilities of the Surety to the Owner shall not be greater than those of the Contractor under the Construction Contract, and the responsibilities of the Owner to the Surety shall not be greater than those of the Owner under the Construction Contract. To the limit of the amount of this Bond, but subject to commitment by the Owner of the Balance of the Contract Price to mitigation of costs and damages on the Construction Contract, the Surety is obligated without duplication for:

AIA Document A312™ – 1984. Copyright © 1984 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 08:58:49 on 10/26/2006 under Order No.1000243847_1 which expires on 8/23/2007, and is not for resale.
User Notes:                                                                                              (1000353622)

2

Case 1:08-cv-03396    Document 18-2    Filed 08/18/2008    Page 4 of 19
Case 1:08-cv-03396    Document 15-2    Filed 07/30/2008    Page 4 of 7
Case 1:08-cv-03396    Document 1-2    Filed 06/12/2008    Page 4 of 46

§ 6.1 The responsibilities of the Contractor for correction of defective work and completion of the Construction Contract;

§ 6.2 Additional legal, design professional and delay costs resulting from the Contractor's Default, and resulting from the actions or failure to act of the Surety under Section 4; and

§ 6.3 Liquidated damages, or if no liquidated damages are specified in the Construction Contract, actual damages caused by delayed performance or non-performance of the Contractor.

§ 7 The Surety shall not be liable to the Owner or others for obligations of the Contractor that are unrelated to the Construction Contract, and the Balance of the Contract Price shall not be reduced or set off on account of any such unrelated obligations. No right of action shall accrue on this Bond to any person or entity other than the Owner or its heirs, executors, administrators or successors.

§ 8 The Surety hereby waives notice of any change, including changes of time, to the Construction Contract or to related subcontracts, purchase orders and other obligations.

§ 9 Any proceeding, legal or equitable, under this Bond may be instituted in any court of competent jurisdiction in the location in which the work or part of the work is located and shall be instituted within two years after Contractor Default or within two years after the Contractor ceased working or within two years after the Surety refuses or fails to perform its obligations under this Bond, whichever occurs first. If the provisions of this Paragraph are void or prohibited by law, the minimum period of limitation available to sureties as a defense in the jurisdiction of the suit shall be applicable.

§ 10 Notice to the Surety, the Owner or the Contractor shall be mailed or delivered to the address shown on the signature page.

§ 11 When this Bond has been furnished to comply with a statutory or other legal requirement in the location where the construction was to be performed, any provision in this Bond conflicting with said statutory or legal requirement shall be deemed deleted here from and provisions conforming to such statutory or other legal requirement shall be deemed incorporated herein. The intent is that this Bond shall be construed as a statutory bond and not as a common law bond.

§ 12 DEFINITIONS

§ 12.1 Balance of the Contract Price: The total amount payable by the Owner to the Contractor under the Construction Contract after all proper adjustments have been made, including allowance to the Contractor of any amounts received or to be received by the Owner in settlement of insurance or other claims for damages to which the Contractor is entitled, reduced by all valid and proper payments made to or on behalf of the Contractor under the Construction Contract.

§ 12.2 Construction Contract: The agreement between the Owner and the Contractor identified on the signature page, including all Contract Documents and changes thereto.

§ 12.3 Contractor Default: Failure of the Contractor, which has neither been remedied nor waived, to perform or otherwise to comply with the terms of the Construction Contract.

§ 12.4 Owner Default: Failure of the Owner, which has neither been remedied nor waived, to pay the Contractor as required by the Construction Contract or to perform and complete or comply with the other terms thereof.

AIA Document A312™ – 1984. Copyright © 1984 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 09:38:49 on 10/26/2006 under Order No.1000243947_1 which expires on 6/23/2007, and is not for resale.
User Notes:                                                                                        (1009359622)

Case 1:08-cv-03396    Document 18-2    Filed 08/18/2008    Page 5 of 19
Case 1:08-cv-03396    Document 15-2    Filed 07/30/2008    Page 5 of 7
Case 1:08-cv-03396    Document 1-2    Filed 06/12/2008    Page 5 of 46

§13 MODIFICATIONS TO THIS BOND ARE AS FOLLOWS:

*(Space is provided below for additional signatures of added parties, other than those appearing on the cover page.)*

CONTRACTOR AS PRINCIPAL                          SURETY
Company:          *(Corporate Seal)*             Company:          *(Corporate Seal)*

Signature: _____                  Signature: _____
Name and Title:                                  Name and Title:
Address:                                          Address:

AIA Document A312™ – 1984. Copyright © 1984 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 09:58:49 on 10/26/2006 under Order No.1000243847_1 which expires on 5/23/2007, and is not for resale.
User Notes:                                                                                              (1009359622)

4

Case 1:08-cv-03396    Document 18-2    Filed 08/18/2008    Page 6 of 19
Case 1:08-cv-03396    Document 15-2    Filed 07/30/2008    Page 6 of 7
Case 1:08-cv-03396    Document 1-2    Filed 06/12/2008    Page 6 of 46

STATE OF ___Illinois_____    ss.:

COUNTY OF ___Will_____

On this ___26th___ day of ___October_____ ___2006___, before me

personally appeared _____William D. Miller_____, to me known, who,

being by me duly sworn, did depose and say: that ___he___ resids(s) at _____

___New Lenox, Illinois___ ; that ___he___ is/are the ___Attorney-in-fact___

of ___Hartford Fire Insurance Company_____, the corporation described

in and which executed the annexed instrument; that ___he___ know(s) the corporate seal of

said corporation; that the seal affixed to said instrument is such corporate seal; that it was

so affixed by order of the Board of Directors of said corporation; that ___he___ signed the

same name(s) thereto by like order; and that the liabilities of said corporation do not ex-

ceed its assets as ascertained in the manner provided by law.

surety
company
acknowledgment

"OFFICIAL SEAL"
MARCIA MAXWELL
NOTARY PUBLIC STATE OF ILLINOIS
My Commission Expires 03/29/2009

BOND-3768-A

_Marcia Maxwell_
(Notary Public in and for the above County and State)

03/29/2009
My commission expires _____

Case 1:08-cv-03396    Document 18-2    Filed 08/18/2008    Page 7 of 19
Case 1:08-cv-03396    Document 15-2    Filed 07/30/2008    Page 7 of 7
Case 1:08-cv-03396    Document 1-2    Filed 06/12/2008    Page 7 of 19

# POWER OF ATTORNEY

Return To: Bond Claims/Claims to:

**THE HARTFORD**
BOND, T-4
690 ASYLUM AVENUE
HARTFORD, CONNECTICUT 06115
call: 888-266-3488 or fax: 860-757-5835
Agency Code: 83-561421

**KNOW ALL PERSONS BY THESE PRESENTS THAT:**

| | |
|---|---|
| X | Hartford Fire Insurance Company, a corporation duly organized under the laws of the State of Connecticut |
| X | Hartford Casualty Insurance Company, a corporation duly organized under the laws of the State of Indiana |
| X | Hartford Accident and Indemnity Company, a corporation duly organized under the laws of the State of Connecticut |
| | Hartford Underwriters Insurance Company, a corporation duly organized under the laws of the State of Connecticut |
| | Twin City Fire Insurance Company, a corporation duly organized under the laws of the State of Indiana |
| X | Hartford Insurance Company of Illinois, a corporation duly organized under the laws of the State of Illinois |
| | Hartford Insurance Company of the Midwest, a corporation duly organized under the laws of the State of Indiana |
| | Hartford Insurance Company of the Southeast, a corporation duly organized under the laws of the State of Florida |

having their home office in Hartford, Connecticut, (hereinafter collectively referred to as the "Companies") do hereby make, constitute and appoint, *up to the amount of unlimited:*

Robert W. Kegley, SueEllen Bottomley, Robert H. Welker, William D. Miller, R.L. McWethy, Kevin J. Scanlon,

of

New Lenox, IL

their true and lawful Attorney(s)-in-Fact, each in their separate capacity if more than one is named above, to sign its name as surety(ies) only as delineated above by ⊠, and to execute, seal and acknowledge any and all bonds, undertakings, contracts and other written instruments in the nature thereof, on behalf of the Companies in their business of guaranteeing the fidelity of persons, guaranteeing the performance of contracts and executing or guaranteeing bonds and undertakings required or permitted in any actions or proceedings allowed by law.

In Witness Whereof, and as authorized by a Resolution of the Board of Directors of the Companies on July 21, 2003 the Companies have caused these presents to be signed by its Assistant Vice President and its corporate seals to be hereto affixed, duly attested by its Assistant Secretary. Further, pursuant to Resolution of the Board of Directors of the Companies, the Companies hereby unambiguously affirm that they are and will be bound by any mechanically applied signatures applied to this Power of Attorney.



Paul A. Bergenholtz, Assistant Secretary

David T. Akers, Assistant Vice President

**STATE OF CONNECTICUT**
} ss. Hartford
**COUNTY OF HARTFORD**

On this 23rd day of July, 2003, before me personally came David T. Akers, to me known, who being by me duly sworn, did depose and say: that he resides in the County of Hampden, Commonwealth of Massachusetts; that he is the Assistant Vice President of the Companies, the corporations described in and which executed the above instrument; that he knows the seals of the said corporations; that the seals affixed to the said instrument are such corporate seals; that they were so affixed by authority of the Boards of Directors of said corporations and that he signed his name thereto by like authority.



CERTIFICATE

Scott E. Paseka
Notary Public
My Commission Expires October 31, 2007

I, the undersigned, Assistant Vice President of the Companies, DO HEREBY CERTIFY that the above and foregoing is a true and correct copy of the Power of Attorney executed by said Companies, which is still in full force effective as of  October 26, 2006

Signed and sealed at the City of Hartford.

       

Yves Cantin, Assistant Vice President

POA 2003

# Exhibit B

Case 1:08-cv-03396    Document 18-2    Filed 08/18/2008    Page 9 of 19
Case 1:08-cv-03396    Document 15-3    Filed 07/30/2008    Page 2 of 6
Case 1:08-cv-03396    Document 1-2    Filed 06/12/2008    Page 9 of 46

# ☰AIA˚ Document A312™ – 1984

*Performance Bond* – BOND #83BCSEJ1942

**CONTRACTOR** *(Name and Address):*

Grace Electrical
Construction Corporation
10390 Deadove Rd., Unit A
Glenview, IL 60025

**OWNER** *(Name and Address):*
Poulos, Inc.
735 S. Laramie Ave.
Chicago, IL 60644

**SURETY** *(Name and Principal Place of Business):*

Hartford Fire Insurance Company
4245 Meridian Parkway
Aurora, IL 60504

**CONSTRUCTION CONTRACT**
Date: April 26, 2007
Amount: One Hundred Eighteen Thousand Dollars & No/100 ($118,000.00)
Description *(Name and Location):*
Stickney Village Hall - Electrical Work
6533 West Pershing Road
Stickney, IL 60402

**BOND**
Date *(Not earlier than Construction Contract Date):* May 10, 2007
Amount: One Hundred Eighteen Thousand Dollars & No/100 ($118,000.00)
Modifications to this Bond:    [ X ]  None        [ ]  See Last Page

| **CONTRACTOR AS PRINCIPAL** Grace Electrical Construction Corporation Company: (Corporate Seal) | **SURETY** Hartford Fire Insurance Company Company: (Corporate Seal) |
|---|---|
| Signature: _____ Name and Title: SON JA CHOUG PRESIDENT | Signature: _____ Name and Title: William D. Miller, Attorney-in-fact |

*(Any additional signatures appear on the last page)*

*(FOR INFORMATION ONLY - Name, Address and Telephone)*
**AGENT or BROKER:**

Kevin J. Scanlon, Columbian Agency
1805 West Laraway Road
New Lenox, IL 60451
815-485-4100

**OWNER'S REPRESENTATIVE**
*(Architect, Engineer or other party):*
Frega Associates, Ltd. (Architect)

**ADDITIONS AND DELETIONS:**
The author of this document has added information needed for its completion. The author may also have revised the text of the original AIA standard form. An *Additions and Deletions Report* that notes added information as well as revisions to the standard form text is available from the author and should be reviewed. A vertical line in the left margin of this document indicates where the author has added necessary information and where the author has added to or deleted from the original AIA text.

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

Any singular reference to Contract, Surety, Owner or other party shall be considered plural where applicable.



EXHIBIT
B

AIA Document A312™ – 1984. Copyright © 1984 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 10:41:21 on 05/10/2007 under Order No.1000243947_1 which expires on 6/23/2007, and is not for resale.
User Notes:                                                                 (3543270519)

1

Case 1:08-cv-03396    Document 18-2    Filed 08/18/2008    Page 10 of 19
Case 1:08-cv-03396    Document 15-3    Filed 07/30/2008    Page 3 of 6
Case 1:08-cv-03396    Document 1-2    Filed 06/12/2008    Page 10 of 46

**§ 1** The Contractor and the Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner for the performance of the Construction Contract, which is incorporated herein by reference.

**§ 2** If the Contractor performs the Construction Contract, the Surety and the Contractor shall have no obligation under this Bond, except to participate in conferences as provided in Section 3.1.

**§ 3** If there is no Owner Default, the Surety's obligation under this Bond shall arise after:

**§ 3.1** The Owner has notified the Contractor and the Surety at its address described in Section 10 below that the Owner is considering declaring a Contractor Default and has requested and attempted to arrange a conference with the Contractor and the Surety to be held not later than fifteen days after receipt of such notice to discuss methods of performing the Construction Contract. If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequently to declare a Contractor Default; and

**§ 3.2** The Owner has declared a Contractor Default and formally terminated the Contractor's right to complete the contract. Such Contractor Default shall not be declared earlier than twenty days after the Contractor and the Surety have received notice as provided in Section 3.1; and

**§ 3.3** The Owner has agreed to pay the Balance of the Contract Price to the Surety in accordance with the terms of the Construction Contract or to a contractor selected to perform the Construction Contract in accordance with the terms of the contract with the Owner.

**§ 4** When the Owner has satisfied the conditions of Section 3, the Surety shall promptly and at the Surety's expense take one of the following actions:

**§ 4.1** Arrange for the Contractor, with consent of the Owner, to perform and complete the Construction Contract; or

**§ 4.2** Undertake to perform and complete the Construction Contract itself, through its agents or through independent contractors; or

**§ 4.3** Obtain bids or negotiated proposals from qualified contractors acceptable to the Owner for a contract for performance and completion of the Construction Contract, arrange for a contract to be prepared for execution by the Owner and the contractor selected with the Owner's concurrence, to be secured with performance and payment bonds executed by a qualified surety equivalent to the bonds issued on the Construction Contract, and pay to the Owner the amount of damages as described in Section 6 in excess of the Balance of the Contract Price incurred by the Owner resulting from the Contractor's default; or

**§ 4.4** Waive its right to perform and complete, arrange for completion, or obtain a new contractor and with reasonable promptness under the circumstances:

    **.1** After investigation, determine the amount for which it may be liable to the Owner and, as soon as practicable after the amount is determined, tender payment therefor to the Owner; or

    **.2** Deny liability in whole or in part and notify the Owner citing reasons therefor.

**§ 5** If the Surety does not proceed as provided in Section 4 with reasonable promptness, the Surety shall be deemed to be in default on this Bond fifteen days after receipt of an additional written notice from the Owner to the Surety demanding that the Surety perform its obligations under this Bond, and the Owner shall be entitled to enforce any remedy available to the Owner. If the Surety proceeds as provided in Section 4.4, and the Owner refuses the payment tendered or the Surety has denied liability, in whole or in part, without further notice the Owner shall be entitled to enforce any remedy available to the Owner.

**§ 6** After the Owner has terminated the Contractor's right to complete the Construction Contract, and if the Surety elects to act under Section 4.1, 4.2, or 4.3 above, then the responsibilities of the Surety to the Owner shall not be greater than those of the Contractor under the Construction Contract, and the responsibilities of the Owner to the Surety shall not be greater than those of the Owner under the Construction Contract. To the limit of the amount of this Bond, but subject to commitment by the Owner of the Balance of the Contract Price to mitigation of costs and damages on the Construction Contract, the Surety is obligated without duplication for:

AIA Document A312™ – 1984. Copyright © 1984 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 10:41:21 on 05/10/2007 under Order No.1000243547_1 which expires on 8/23/2007, and is not for resale.
User Notes:    (3343270519)

2

Case 1:08-cv-03396    Document 18-2    Filed 08/18/2008    Page 11 of 19
Case 1:08-cv-03396    Document 15-3    Filed 07/30/2008    Page 4 of 6
Case 1:08-cv-03396    Document 1-2    Filed 06/12/2008    Page 11 of 46

§ 6.1 The responsibilities of the Contractor for correction of defective work and completion of the Construction Contract;

§ 6.2 Additional legal, design professional and delay costs resulting from the Contractor's Default, and resulting from the actions or failure to act of the Surety under Section 4; and

§ 6.3 Liquidated damages, or if no liquidated damages are specified in the Construction Contract, actual damages caused by delayed performance or non-performance of the Contractor.

§ 7 The Surety shall not be liable to the Owner or others for obligations of the Contractor that are unrelated to the Construction Contract, and the Balance of the Contract Price shall not be reduced or set off on account of any such unrelated obligations. No right of action shall accrue on this Bond to any person or entity other than the Owner or its heirs, executors, administrators or successors.

§ 8 The Surety hereby waives notice of any change, including changes of time, to the Construction Contract or to related subcontracts, purchase orders and other obligations.

§ 9 Any proceeding, legal or equitable, under this Bond may be instituted in any court of competent jurisdiction in the location in which the work or part of the work is located and shall be instituted within two years after Contractor Default or within two years after the Contractor ceased working or within two years after the Surety refuses or fails to perform its obligations under this Bond, whichever occurs first. If the provisions of this Paragraph are void or prohibited by law, the minimum period of limitation available to sureties as a defense in the jurisdiction of the suit shall be applicable.

§ 10 Notice to the Surety, the Owner or the Contractor shall be mailed or delivered to the address shown on the signature page.

§ 11 When this Bond has been furnished to comply with a statutory or other legal requirement in the location where the construction was to be performed, any provision in this Bond conflicting with said statutory or legal requirement shall be deemed deleted here from and provisions conforming to such statutory or other legal requirement shall be deemed incorporated herein. The intent is that this Bond shall be construed as a statutory bond and not as a common law bond.

§ 12 DEFINITIONS
§ 12.1 Balance of the Contract Price: The total amount payable by the Owner to the Contractor under the Construction Contract after all proper adjustments have been made, including allowance to the Contractor of any amounts received or to be received by the Owner in settlement of insurance or other claims for damages to which the Contractor is entitled, reduced by all valid and proper payments made to or on behalf of the Contractor under the Construction Contract.

§ 12.2 Construction Contract: The agreement between the Owner and the Contractor identified on the signature page, including all Contract Documents and changes thereto.

§ 12.3 Contractor Default: Failure of the Contractor, which has neither been remedied nor waived, to perform or otherwise to comply with the terms of the Construction Contract.

§ 12.4 Owner Default: Failure of the Owner, which has neither been remedied nor waived, to pay the Contractor as required by the Construction Contract or to perform and complete or comply with the other terms thereof.

AIA Document A312™ – 1984. Copyright © 1984 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 10:41:21 on 05/10/2007 under Order No.1000243947_1 which expires on 5/23/2007, and is not for resale.
User Notes:                                                                                          (3543270519)

3

Case 1:08-cv-03396    Document 18-2    Filed 08/18/2008    Page 12 of 19
Case 1:08-cv-03396    Document 15-3    Filed 07/30/2008    Page 5 of 6
Case 1:08-cv-03396    Document 1-2    Filed 06/12/2008    Page 12 of 46

# POWER OF ATTORNEY

Direct Inquiries/Claims to:
**THE HARTFORD**
BOND, T-4
690 ASYLUM AVENUE
HARTFORD, CONNECTICUT 06115
call: 888-266-3488 or fax: 860-757-5835

Agency Code: 83-561421

KNOW ALL PERSONS BY THESE PRESENTS THAT:

| | |
|---|---|
| X | Hartford Fire Insurance Company, a corporation duly organized under the laws of the State of Connecticut |
| X | Hartford Casualty Insurance Company, a corporation duly organized under the laws of the State of Indiana |
| X | Hartford Accident and Indemnity Company, a corporation duly organized under the laws of the State of Connecticut |
| | Hartford Underwriters Insurance Company, a corporation duly organized under the laws of the State of Connecticut |
| | Twin City Fire Insurance Company, a corporation duly organized under the laws of the State of Indiana |
| X | Hartford Insurance Company of Illinois, a corporation duly organized under the laws of the State of Illinois |
| | Hartford Insurance Company of the Midwest, a corporation duly organized under the laws of the State of Indiana |
| | Hartford Insurance Company of the Southeast, a corporation duly organized under the laws of the State of Florida |

having their home office in Hartford, Connecticut, (hereinafter collectively referred to as the "Companies") do hereby make, constitute and appoint, up to the amount of unlimited:

Robert W. Kegley, Suellen Bottomley, Robert H. Walker, William D. Miller, R.L. McWethy, Kevin J. Scanlon of

New Lenox, IL

their true and lawful Attorney(s)-in-Fact, each in their separate capacity if more than one is named above, to sign its name as surety(ies) only as delineated above by ☒, and to execute, seal and acknowledge any and all bonds, undertakings, contracts and other written instruments in the nature thereof, on behalf of the Companies in their business of guaranteeing the fidelity of persons, guaranteeing the performance of contracts and executing or guaranteeing bonds and undertakings required or permitted in any actions or proceedings allowed by law.

In Witness Whereof, and as authorized by a Resolution of the Board of Directors of the Companies on July 21, 2003 the Companies have caused these presents to be signed by its Assistant Vice President and its corporate seals to be hereto affixed, duly attested by its Assistant Secretary. Further, pursuant to Resolution of the Board of Directors of the Companies, the Companies hereby unambiguously affirm that they are and will be bound by any mechanically applied signatures applied to this Power of Attorney.



Paul A. Bergenholtz, Assistant Secretary

David T. Akers, Assistant Vice President

STATE OF CONNECTICUT
COUNTY OF HARTFORD } ss. Hartford

On this 23rd day of July, 2003, before me personally came David T. Akers, to me known, who being by me duly sworn, did depose and say: that he resides in the County of Hampden, Commonwealth of Massachusetts; that he is the Assistant Vice President of the Companies, the corporations described in and which executed the above instrument; that he knows the seals of the said corporations; that the seals affixed to the said instrument are such corporate seals; that they were so affixed by authority of the Boards of Directors of said corporations and that he signed his name thereto by like authority.

CERTIFICATE

Scott E. Paseka,
Notary Public
My Commission Expires October 31, 2007

I, the undersigned, Assistant Vice President of the Companies, DO HEREBY CERTIFY that the above and foregoing is a true and correct copy of the Power of Attorney executed by said Companies, which is still in full force effective as of May 10, 2007.

Signed and sealed at the City of Hartford.

      

Yves Cantin, Assistant Vice President

Case 1:08-cv-03396   Document 18-2   Filed 08/18/2008   Page 13 of 19
Case 1:08-cv-03396   Document 15-3   Filed 07/30/2008   Page 6 of 6
Case 1:08-cv-03396   Document 1-2   Filed 06/12/2008   Page 33 of 46

Company
Acknowledgment

STATE OF ____Illinois____

COUNTY OF ____Will____   } ss.:

On this ____10th____ day of ____May____ ____2007____, before me personally appeared ____William D. Miller____, to me known, who, being by me duly sworn, did depose and say: that ____he____ reside(s) at ____New Lenox, Illinois____; that ____he____ is/are the ____Attorney-in-fact____ of ____Hartford Fire Insurance Company____ the corporation described in and which executed the annexed instrument; that ____he____ know(s) the corporate seal of said corporation; that the seal affixed to said instrument is such corporate seal; that it was so affixed by order of the Board of Directors of said corporation; that ____he____ signed the same name(s) thereto by like order; and that the liabilities of said corporation do not exceed its assets as ascertained in the manner provided by law.

OFFICIAL SEAL
MARCIA MAXWELL
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 3-29-2009
BOND-3786-A

_____
(Notary Public in and for the above County and State)

My commission expires ____3-29-2009____

# Exhibit C

Case 1:08-cv-03396    Document 18-2    Filed 08/18/2008    Page 15 of 19
Case 1:08-cv-03396    Document 15-4    Filed 07/30/2008    Page 2 of 6
Case 1:08-cv-03396    Document 1-2    Filed 06/12/2008    Page 15 of 46

# ≋AIA® Document A312™ – 1984

*Performance Bond* – BOND# 83BCSEB7701

**CONTRACTOR** *(Name and Address):*

Grace Electrical
Construction Corporation
10350 Dearlove Rd., Unit C
Glenview, IL 60025

**OWNER** *(Name and Address):*

Poulos, Inc.
735 S. Laramie Ave.
Chicago, IL 60644

**CONSTRUCTION CONTRACT**
Date: May 24, 2006
Amount: One Million Three Hundred Twenty Four Thousand Seven Hundred
Dollars & No/100 ($1,324,700.00)
Description *(Name and Location):*
Sunny Hill Skilled Rehab Center Renovations
421 Doris Avenue
Joliet, IL 60433
**BOND**
Date *(Not earlier than Construction Contract Date):* August 14, 2006
Amount: One Million Three Hundred Twenty Four Thousand Seven Hundred
Dollars & No/100 ($1,324,700.00)
Modifications to this Bond: [ X ] None   [ ] See Last Page

**SURETY** *(Name and Principal Place of Business):*

Hartford Fire Insurance Company
4245 Meridian Parkway
Aurora, IL 60504

**ADDITIONS AND DELETIONS:**
The author of this document has added information needed for its completion. The author may also have revised the text of the original AIA standard form. An *Additions and Deletions Report* that notes added information as well as revisions to the standard form text is available from the author and should be reviewed. A vertical line in the left margin of this document indicates where the author has added necessary information and where the author has added to or deleted from the original AIA text.

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

Any singular reference to Contract, Surety, Owner or other party shall be considered plural where applicable.

| CONTRACTOR AS PRINCIPAL Grace Electrical Construction Corporation | SURETY Hartford Fire Insurance |
|---|---|
| Company: {Corporate Seal} | Company: {Corporate Seal} |
| Signature: | Signature: |
| Name and Soon Ja Chung | Name and William D. |
| Title: president | Title: Miller, Attorney-in-fact |

*(Any additional signatures appear on the last page)*

*(FOR INFORMATION ONLY - Name, Address and Telephone)*
**AGENT or BROKER:**

Kevin J. Scanlon, Columbian Agency
1005 West Laraway Road
New Lenox, IL 60451
815-485-4100

**OWNER'S REPRESENTATIVE**
*(Architect, Engineer or other party):*
Farnsworth Group, Inc.
(Architect)

**EXHIBIT**
C

AIA Document A312™ – 1984. Copyright © 1984 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:11:02 on 08/14/2006 under Order No.1000243947_1 which expires on 8/22/2007, and is not for resale.
User Notes:                          (2950785643)

1

Case 1:08-cv-03396    Document 18-2    Filed 08/18/2008    Page 16 of 19
Case 1:08-cv-03396    Document 15-4    Filed 07/30/2008    Page 3 of 6
Case 1:08-cv-03396    Document 1-2    Filed 06/12/2008    Page 16 of 46

§ 1 The Contractor and the Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner for the performance of the Construction Contract, which is incorporated herein by reference.

§ 2 If the Contractor performs the Construction Contract, the Surety and the Contractor shall have no obligation under this Bond, except to participate in conferences as provided in Section 3.1.

§ 3 If there is no Owner Default, the Surety's obligation under this Bond shall arise after:
§ 3.1 The Owner has notified the Contractor and the Surety at its address described in Section 10 below that the Owner is considering declaring a Contractor Default and has requested and attempted to arrange a conference with the Contractor and the Surety to be held not later than fifteen days after receipt of such notice to discuss methods of performing the Construction Contract. If the Owner, the Contractor and the Surety agree, the Contractor shall be allowed a reasonable time to perform the Construction Contract, but such an agreement shall not waive the Owner's right, if any, subsequently to declare a Contractor Default; and

§ 3.2 The Owner has declared a Contractor Default and formally terminated the Contractor's right to complete the contract. Such Contractor Default shall not be declared earlier than twenty days after the Contractor and the Surety have received notice as provided in Section 3.1; and

§ 3.3 The Owner has agreed to pay the Balance of the Contract Price to the Surety in accordance with the terms of the Construction Contract or to a contractor selected to perform the Construction Contract in accordance with the terms of the contract with the Owner.

§ 4 When the Owner has satisfied the conditions of Section 3, the Surety shall promptly and at the Surety's expense take one of the following actions:
§ 4.1 Arrange for the Contractor, with consent of the Owner, to perform and complete the Construction Contract; or

§ 4.2 Undertake to perform and complete the Construction Contract itself, through its agents or through independent contractors; or

§ 4.3 Obtain bids or negotiated proposals from qualified contractors acceptable to the Owner for a contract for performance and completion of the Construction Contract, arrange for a contract to be prepared for execution by the Owner and the contractor selected with the Owner's concurrence, to be secured with performance and payment bonds executed by a qualified surety equivalent to the bonds issued on the Construction Contract, and pay to the Owner the amount of damages as described in Section 6 in excess of the Balance of the Contract Price incurred by the Owner resulting from the Contractor's default; or

§ 4.4 Waive its right to perform and complete, arrange for completion, or obtain a new contractor and with reasonable promptness under the circumstances:
    .1    After investigation, determine the amount for which it may be liable to the Owner and, as soon as practicable after the amount is determined, tender payment therefor to the Owner; or
    .2    Deny liability in whole or in part and notify the Owner citing reasons therefor.

§ 5 If the Surety does not proceed as provided in Section 4 with reasonable promptness, the Surety shall be deemed to be in default on this Bond fifteen days after receipt of an additional written notice from the Owner to the Surety demanding that the Surety perform its obligations under this Bond, and the Owner shall be entitled to enforce any remedy available to the Owner. If the Surety proceeds as provided in Section 4.4, and the Owner refuses the payment tendered or the Surety has denied liability, in whole or in part, without further notice the Owner shall be entitled to enforce any remedy available to the Owner.

§ 6 After the Owner has terminated the Contractor's right to complete the Construction Contract, and if the Surety elects to act under Section 4.1, 4.2, or 4.3 above, then the responsibilities of the Surety to the Owner shall not be greater than those of the Contractor under the Construction Contract, and the responsibilities of the Owner to the Surety shall not be greater than those of the Owner under the Construction Contract. To the limit of the amount of this Bond, but subject to commitment by the Owner of the Balance of the Contract Price to mitigation of costs and damages on the Construction Contract, the Surety is obligated without duplication for:

AIA Document A312™ – 1984. Copyright © 1984 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:11:02 on 09/14/2006 under Order No.1000243947_1 which expires on 8/23/2007, and is not for resale.
User Notes:                                                                                                 (2060755641)

2

§ 6.1 The responsibilities of the Contractor for correction of defective work and completion of the Construction Contract;

§ 6.2 Additional legal, design professional and delay costs resulting from the Contractor's Default, and resulting from the actions or failure to act of the Surety under Section 4; and

§ 6.3 Liquidated damages, or if no liquidated damages are specified in the Construction Contract, actual damages caused by delayed performance or non-performance of the Contractor.

§ 7 The Surety shall not be liable to the Owner or others for obligations of the Contractor that are unrelated to the Construction Contract, and the Balance of the Contract Price shall not be reduced or set off on account of any such unrelated obligations. No right of action shall accrue on this Bond to any person or entity other than the Owner or its heirs, executors, administrators or successors.

§ 8 The Surety hereby waives notice of any change, including changes of time, to the Construction Contract or to related subcontracts, purchase orders and other obligations.

§ 9 Any proceeding, legal or equitable, under this Bond may be instituted in any court of competent jurisdiction in the location in which the work or part of the work is located and shall be instituted within two years after Contractor Default or within two years after the Contractor ceased working or within two years after the Surety refuses or fails to perform its obligations under this Bond, whichever occurs first. If the provisions of this Paragraph are void or prohibited by law, the minimum period of limitation available to sureties as a defense in the jurisdiction of the suit shall be applicable.

§ 10 Notice to the Surety, the Owner or the Contractor shall be mailed or delivered to the address shown on the signature page.

§ 11 When this Bond has been furnished to comply with a statutory or other legal requirement in the location where the construction was to be performed, any provision in this Bond conflicting with said statutory or legal requirement shall be deemed deleted here from and provisions conforming to such statutory or other legal requirement shall be deemed incorporated herein. The intent is that this Bond shall be construed as a statutory bond and not as a common law bond.

### § 12 DEFINITIONS

§ 12.1 Balance of the Contract Price: The total amount payable by the Owner to the Contractor under the Construction Contract after all proper adjustments have been made, including allowance to the Contractor of any amounts received or to be received by the Owner in settlement of insurance or other claims for damages to which the Contractor is entitled, reduced by all valid and proper payments made to or on behalf of the Contractor under the Construction Contract.

§ 12.2 Construction Contract: The agreement between the Owner and the Contractor identified on the signature page, including all Contract Documents and changes thereto.

§ 12.3 Contractor Default: Failure of the Contractor, which has neither been remedied nor waived, to perform or otherwise to comply with the terms of the Construction Contract.

§ 12.4 Owner Default: Failure of the Owner, which has neither been remedied nor waived, to pay the Contractor as required by the Construction Contract or to perform and complete or comply with the other terms thereof.

AIA Document A312™ – 1984. Copyright © 1984 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:11:02 on 08/14/2008 under Order No.1000043842_1 which expires on 5/23/2007, and is not for resale.
User Notes:    (2960755641)

Case 1:08-cv-03396    Document 18-2    Filed 08/18/2008    Page 18 of 19
Case 1:08-cv-03396    Document 15-4    Filed 07/30/2008    Page 5 of 6
Case 1:08-cv-03396    Document 1-2    Filed 06/12/2008    Page 18 of 46

§ 13 MODIFICATIONS TO THIS BOND ARE AS FOLLOWS:

*(Space is provided below for additional signatures of added parties, other than those appearing on the cover page.)*

| CONTRACTOR AS PRINCIPAL | | SURETY | |
|---|---|---|---|
| Company: | *(Corporate Seal)* | Company: | *(Corporate Seal)* |
| | | | |
| Signature: | _____ | Signature: | _____ |
| Name and Title: | | Name and Title: | |
| Address: | | Address: | |

AIA Document A312™ – 1984. Copyright © 1984 by The American Institute of Architects. All rights reserved. WARNING: This AIA Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:11:02 on 06/14/2008 under Order No.1000243947_1 which expires on 8/23/2007, and is not for resale.
User Notes:                                                      (2960755641)

4

Case 1:08-cv-03396     Document 18-2     Filed 08/18/2008     Page 19 of 19
Case 1:08-cv-03396     Document 15-4     Filed 07/30/2008     Page 6 of 6
Case 1:08-cv-03396     Document 1-2     Filed 06/12/2008     Page 19 of 46

# POWER OF ATTORNEY

THE HARTFORD
BOND, T-4
690 ASYLUM AVENUE
HARTFORD, CONNECTICUT 06115
call: 888-266-3488 or fax: 860-757-5835

Agency Code: 83-551421

## KNOW ALL PERSONS BY THESE PRESENTS THAT:

[X] Hartford Fire Insurance Company, a corporation duly organized under the laws of the State of Connecticut
[X] Hartford Casualty Insurance Company, a corporation duly organized under the laws of the State of Indiana
[X] Hartford Accident and Indemnity Company, a corporation duly organized under the laws of the State of Connecticut
[ ] Hartford Underwriters Insurance Company, a corporation duly organized under the laws of the State of Connecticut
[ ] Twin City Fire Insurance Company, a corporation duly organized under the laws of the State of Indiana
[X] Hartford Insurance Company of Illinois, a corporation duly organized under the laws of the State of Illinois
[ ] Hartford Insurance Company of the Midwest, a corporation duly organized under the laws of the State of Indiana
[ ] Hartford Insurance Company of the Southeast, a corporation duly organized under the laws of the State of Florida

having their home office in Hartford, Connecticut, (hereinafter collectively referred to as the "Companies") do hereby make, constitute and appoint, up to the amount of unlimited:

Robert W. Kegley, Suellen Bottomley, Robert H. Walker, William D. Miller, R.L. McWethy, Kevin J. Scanlon

of

New Lenox, IL

their true and lawful Attorney(s)-in-Fact, each in their separate capacity if more than one is named above, to sign its name as surety(ies) only as delineated above by ☒, and to execute, seal and acknowledge any and all bonds, undertakings, contracts and other written instruments in the nature thereof, on behalf of the Companies in their business of guaranteeing the fidelity of persons, guaranteeing the performance of contracts and executing or guaranteeing bonds and undertakings required or permitted in any actions or proceedings allowed by law.

In Witness Whereof, and as authorized by a Resolution of the Board of Directors of the Companies on July 21, 2003 the Companies have caused these presents to be signed by its Assistant Vice President and its corporate seals to be hereto affixed, duly attested by its Assistant Secretary. Further, pursuant to Resolution of the Board of Directors of the Companies, the Companies hereby unambiguously affirm that they are and will be bound by any mechanically applied signatures applied to this Power of Attorney.



Paul A. Bergenholtz, Assistant Secretary

David T. Akers, Assistant Vice President

STATE OF CONNECTICUT  }
                        } ss.  Hartford
COUNTY OF HARTFORD     }

On this 23rd day of July, 2003, before me personally came David T. Akers, to me known, who being by me duly sworn, did depose and say: that he resides in the County of Hampden, Commonwealth of Massachusetts; that he is the Assistant Vice President of the Companies, the corporations described in and which executed the above instrument; that he knows the seals of the said corporations; that the seals affixed to the said instrument are such corporate seals; that they were so affixed by authority of the Boards of Directors of said corporations and that he signed his name thereto by like authority.

Scott E. Paseka
Notary Public
My Commission Expires October 31, 2007

CERTIFICATE

I, the undersigned, Assistant Vice President of the Companies, DO HEREBY CERTIFY that the above and foregoing is a true and correct copy of the Power of Attorney executed by said Companies, which is still in full force effective as of August 14, 2006

Signed and sealed at the City of Hartford.



Yves Cantin, Assistant Vice President

POA 2003

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| POULOS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.:  08 CV 3396 |
| v. | ) | |
| | ) | Judge:  Shadur |
| HARTFORD FIRE INSURANCE CO., | ) | |
| | ) | |
| Defendant. | ) | |

### NOTICE OF FILING

PLEASE TAKE NOTICE THAT, on this 18th day of August, 2008, we caused to be filed with the Clerk of the United States District Court, Northern District of Illinois, Hartford Insurance Company's Answer and Affirmative Defenses, true and exact copies of which are herewith attached.

**Safeco Insurance Company**

By:  /s/ John E. Sebastian _____
One of its Attorneys

John E. Sebastian, ARDC #: 6230240
Hinshaw & Culbertson, LLP
222 North LaSalle, Suite 300
Chicago, Illinois 60601
312-704-3000

### CERTIFICATE OF SERVICE

I, the undersigned attorney, certify that I filed this Notice and the document referenced herein through the Court's ECM/CF system, which will cause electronic notification of this filing to be sent to all counsel of record.

By: s/s John E. Sebastian _____